IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

GRABHORN, INC., an Oregon corporation,

        Plaintiff,

vs.

METROPOLITAN SERVICE DISTRICT,

        Defendant.

Civil Case No. 08-1512-KI

OPINION AND ORDER

    George W. McKallip, Jr.
    Jeff D. Brecht
    Sussman Shank LLP
    1000 SW Broadway, Suite 1400
    Portland, Oregon  97205-3089

        Attorneys for Plaintiff

    Dan Cooper
    Michelle A. Bellia
    Office of Metro Attorney
    600 NE Grand Avenue
    Portland, Oregon  97232-2736

        Attorneys for Defendant

Page 1 - OPINION AND ORDER

KING, Judge:

Plaintiff Grabhorn, Inc. owns and operates a dry solid waste facility, the Lakeside Reclamation Landfill ("Lakeside"). Grabhorn has a Designated Facilities Agreement ("DFA") with defendant Metropolitan Service District ("Metro") to collect solid waste from areas within Metro's boundaries. This action arose due to Metro's unilateral termination of Grabhorn's DFA. Before the court is Metro's motion to dismiss for failure to state a claim and some related motions. For the reasons below, I do not dismiss any of the claims.

## LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(6) will be granted if plaintiff fails to allege the "grounds" of his "entitlement to relief." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007) (quotation omitted) (abrogating Conley v. Gibson, 355 U.S. 41, 45-46 (1957) and its test that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim"). A plaintiff does not need to allege detailed facts, but such a requirement demands "more than labels and conclusions, [or] a formulaic recitation of the elements of a cause of action." Id. Furthermore, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. (internal citations and quotations omitted). Normally, analysis of a motion to dismiss is limited to the complaint, and all allegations of material fact are taken as true and viewed in the light most favorable to the non-moving party. Diaz v. Int'l Longshore and Warehouse Union, Local 13, 474 F.3d 1202, 1205 (9th Cir. 2007). Exceptions to this rule are discussed below.

## PRELIMINARY MATTERS

Metro asks the court to judicially notice several documents and consider an additional document, all without converting the motion to dismiss to a motion for summary judgment under Federal Rule of Civil Procedure 12(d):

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Grabhorn objects, arguing that the 400 pages of extraneous documents paint an incomplete and skewed picture if the court assumes that the facts and analysis within the documents are accurate, complete, uncontroverted, and dispositive. Grabhorn notes that some of the documents were prepared by Metro specifically in order to attempt to justify its actions toward Grabhorn. Thus, if the court grants Metro's motion and considers the documents, Grabhorn asks the court to convert the motion to dismiss to a motion for summary judgment and hold it in abeyance under Federal Rule of Civil Procedure 56(f) until discovery is complete.

The court may take judicial notice of matters of public record which are not subject to reasonable dispute over authenticity, including the existence of another court's opinion, but may not take notice of the truth of facts recited in the opinion. <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 688-90 (9th Cir. 2001) (based on a Waiver of Extradition form and a transcript of the extradition hearing, court could take judicial notice of the fact of the extradition hearing, the fact that the Waiver was signed by Kerry Sanders, and the fact that Kerry Sanders purportedly waived his right to challenge his extradition to New York as Robert Sanders; the court could not take judicial notice of disputed facts stated in public records, such as the validity of the waiver).

Metro asks me to take judicial notice of the Metro Charter; the Code of the Metropolitan Service District, Chapters 5.01 and 5.05; and Ordinance No. 07-1147B, which amended the Metro Code, with the latest sections taking effect on July 1, 2009.

These documents are part of the law which governs Metro.  Although I do not see the necessity of formally taking judicial notice of the law, the Ninth Circuit has held that municipal ordinances are the proper subject of judicial notice.  Tollis, Inc. v. County of San Diego, 505 F.3d 935, 938 n.1 (9th Cir. 2007), cert. denied, 128 S. Ct. 2514 (2008).  Thus, I grant Metro's motion concerning these four documents.

Metro also asks me to take judicial notice of Metro Resolution No. 08-3990 (For the Purpose of Denying a Variance Request Submitted by Lakeside Reclamation Landfill) and Metro Resolution No. 08-4009 (For the Purpose of Terminating the Designated Facility Agreement Entered into Between Metro and Lakeside Reclamation Landfill).  These two documents are similar to the documents discussed in Lee in that they report two public actions taken by Metro.  I take judicial notice of the fact that Metro adopted the two Resolutions but I make no finding of whether Metro's conduct in doing so was constitutional and nontortious.

Metro also asks me to consider Metro Contract No. 902857, the DFA entered into by Metro and Grabhorn in 1993, without converting the motion to dismiss into a motion for summary judgment.

The court may review a document extrinsic to the complaint if the authenticity of the document is not contested and the document is integral to the claims.  Fields v. Legacy Health System, 413 F.3d 943, 958 n.13 (9th Cir. 2005).  Grabhorn does not dispute the authenticity of the DFA.

Page 4 - OPINION AND ORDER

Grabhorn alleges entering into this DFA in the First Amended Complaint, ¶ 14, but does not attach the DFA to the complaint. Several of Grabhorn's claims depend on the DFA, including portions of the equal protection claim and the regulatory takings claim. The DFA is also the contract underlying Grabhorn's breach of the covenant of good faith and fair dealing claim. I conclude that the DFA is integral to several of Grabhorn's claims and, accordingly, I will consider the document in my analysis of the motion to dismiss.

## ALLEGED FACTS

Grabhorn has operated Lakeside as a dry solid waste facility since 1953. Lakeside has operated under all necessary Oregon Department of Environmental Quality ("DEQ") permits since 1972. The current permit provides that Lakeside will stop accepting dry solid waste on June 30, 2009.

Although Grabhorn is not within the Metro region, it obtained Designated Facility status from Metro in 1993 and entered into a DFA, a contract which allows Lakeside to receive dry solid waste generated within the jurisdictional boundaries of Metro. Historically, Lakeside received about 85% of its dry solid waste under the DFA. The Lakeside closing plan, which is approved by DEQ, relies on a steady stream of materials under the DFA until the closing date.

On August 16, 2007, Metro enacted the Enhanced Dry Waste Recovery Program ("EDWRP"), Ordinance No. 07-1147B, which states:

> WHEREAS, Metro is accountable for meeting the state-mandated 2009 waste reduction goal for the tri-county region, and the recovery of additional "dry waste" material generated by the building industry is a key component of reaching the 64% goal; and
>
> . . . .
>
> WHEREAS, by July 1, 2009, it is the intent of the Metro Council that all dry waste originating from the Metro region be subject to processing for material

recovery and to ensure competition in the Metro region's dry waste processing industry;

Ordinance No. 07-1147B at 1.

The EDWRP requires all DFAs to be amended so that they are in substantial compliance with EDWRP by December 31, 2008, unless the Designated Facility is granted a variance. The EDWRP exempts facilities owned or operated by Metro from compliance. Metro Code § 5.01.040(a)(2). These Metro facilities compete for business with Lakeside.

Absent a variance, all DFAs not amended by November 1, 2008 to comply with EDWRP were to be terminated by Metro's Chief Operating Officer by December 31, 2008. Grabhorn sought a variance to extend its DFA, without amendment, for six months, from January 1, 2009 to June 30, 2009 so that the DFA would expire on the same date that Grabhorn's DEQ permit was expiring. June 30, 2009 is also the day the EDWRP becomes enforceable.

Metro granted a variance for EDWRP compliance to Hillsboro Landfill, which is similarly situated to Lakeside. On October 23, 2008, Metro denied Grabhorn's request for a variance. On December 18, 2008, Metro passed Resolution No. 08-4009 which terminated Grabhorn's DFA effective December 31, 2008.

## DISCUSSION

I.  Procedural Due Process

Grabhorn alleges that Metro violated Grabhorn's due process rights prior to denying the request for a variance by failing: (1) to inform Grabhorn of the criteria employed in considering the variance request; (2) to timely inform Grabhorn of any objections; (3) to give Grabhorn the opportunity to prepare a response to any objections; and (4) to timely provide Grabhorn with the Staff Report or the Chief Operating Officer's recommendations to counsel. Grabhorn further

alleges that Metro violated Grabhorn's due process rights by failing to provide an adequate means for Grabhorn to seek redress of Metro's denial of the variance request. Under Metro's rules, Grabhorn could only request a contested case hearing that was allegedly constitutionally deficient due to being conducted by someone who is inherently biased; by having Metro control the hearing procedural rules concerning discovery, evidence, and the hearing itself; and because the Metro Council or its Chief Operating Officer makes the final decision based on the contested case record and proposed findings of fact and conclusions of law, which may be revised by Metro.

> To obtain relief on a procedural due process claim, the plaintiff must establish the existence of (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process. The Due Process Clause forbids the governmental deprivation of substantive rights without constitutionally adequate procedure. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985). Not every procedural requirement ordained by state law, however, creates a substantive property interest entitled to constitutional protection. Rather, only those rules or understandings that support legitimate claims of entitlement give rise to protected property interests.

Shanks v. Dressel, 540 F.3d 1082, 1090-91 (9th Cir. 2008) (internal quotation and citation omitted).

    A.    Property Interest

Metro argues that Grabhorn cannot establish a constitutionally-protected property interest because it has no legal entitlement to the continuation of the DFA. According to Metro, Grabhorn's interest in the DFA is purely contractual and is not subject to constitutional protection. Metro argues that its relationship with Grabhorn is completely voluntary because Grabhorn could terminate the DFA and still operate as a solid waste disposal site outside of Metro's boundary. According to Metro, Grabhorn can still receive solid waste generated in the Metro region if the hauler interested in using Lakeside secures a non-system license. Metro claims that Grabhorn has

Page 7 - OPINION AND ORDER

not identified a provision in the Metro Code in which Metro places mandatory requirements on Grabhorn.

Grabhorn contends that license and permit applicants have a property interest protectable under the Due Process Clause when the regulations underlying the interest are mandatory in nature. Grabhorn argues that its protectable property interest is in Lakeside operating as a DEQ-permitted dry solid waste facility, in its status as a Designated Facility, and in its DFA with Metro. According to Grabhorn, the termination of the DFA effectively terminated Grabhorn's status as a Designated Facility. Grabhorn notes its allegations that Metro could not terminate those interests without good cause, due process, and compliance with mandatory requirements. Relying on the Metro Code, Grabhorn claims that the Code does not show if Metro complied with the mandatory requirements but the Code does establish that Grabhorn had a reasonable expectation of entitlement to operating a facility and that its Designated Facility status and its DFA would not be unilaterally terminated without due process.

Permit and licensing applicants have a property interested protected by the Due Process Clause when "the regulations establishing entitlement to the benefit are . . . mandatory in nature." Foss v. Nat'l Marine Fisheries Serv., 161 F.3d 584, 588 (9th Cir. 1998)

> Only if the governing statute compels a result "upon compliance with certain criteria, none of which involve the exercise of discretion by the reviewing body," does it create a constitutionally protected property interest. Thornton v. City of St. Helens, 425 F.3d 1158, 1164-65 (9th Cir.2005); see also Foss v. Nat'l Marine Fisheries Serv., 161 F.3d 584, 588 (9th Cir.1998) (holding that "specific, mandatory" and "carefully circumscribed" requirements constrained discretion enough to give rise to property interest). Conversely, "a statute that grants the reviewing body unfettered discretion to approve or deny an application does not create a property right." Thornton, 425 F.3d at 1164. There is no protected property interest if "the reviewing body has discretion . . . to impose licensing criteria of its own creation." Id. at 1165.

Shanks, 540 F.3d at 1091.

Page 8 - OPINION AND ORDER

The Metro Code provides that:

In deciding whether to designate an additional facility, or amend or delete an existing designation, the Council shall consider:

(1) The degree to which prior users of the facility and waste types accepted at the facility are known and the degree to which such wastes pose a future risk of environmental contamination;

(2) The record of regulatory compliance of the facility's owner and operator with federal, state and local requirements, including but not limited to public health, safety and environmental rules and regulations;

(3) The adequacy of operational practices and management controls at the facility;

(4) The expected impact on the region's recycling and waste reduction efforts;

(5) The consistency of the designation with Metro's existing contractual arrangements;

(6) The record of the facility regarding compliance with Metro ordinances and agreements or assistance to Metro in Metro ordinance enforcement; and

(7) Other benefits or detriments accruing to residents of the region from Council action in designating a facility, or amending or deleting an existing designation.

Metro Code § 5.05.030(b).

If the Chief Operating Officer is unable to modify a DFA to satisfy the EDWRP, "then the Chief Operating Officer shall terminate the existing agreement following termination procedures described in the existing agreement." Id. § 5.05.030(c). The DFA states: "The Metro Council may modify, suspend or terminate this Agreement, for good cause or substantial change of circumstances, upon passage of a resolution specifying the action taken and the effective date." Norton Decl. Ex. 1 at 5 ¶ 7(c). If the DFA is terminated without reasonable notice and an

opportunity to be heard prior to the Council action, the company "shall be entitled to a contested case hearing." Id. at 5 ¶ 7(d). Moreover:

> Nothing in this section shall be interpreted to hinder or prevent Metro from making and enforcing policy judgments related to the flow of solid waste out of Metro boundaries, regardless of the perceived or actual impact of such decisions on Company's business. A policy judgment by Metro to limit or prevent waste generated within Metro boundaries from entering the Facility shall under no circumstances be the basis for payment of compensation by Metro to Company.

Id. at 5 ¶ 7(e).

Metro argues that Grabhorn's situation is similar to the physicians' group whose contract to supply medical services was terminated by the county in San Bernadino Physicians' Services Med. Group, Inc. v. County of San Bernadino, 825 F.2d 1404 (9th Cir. 1987). The court recognized that contracts could create constitutionally protected property interests but held that the medical services contract did not create a property interest because it was not an employment contract and could not "sensibly be distinguished from construction contracts or even purely material supply contracts." Id. at 1410.

I agree with Grabhorn that its situation is more akin to plaintiffs who are denied licenses than to the physicians' group in San Bernadino. Grabhorn is not doing business with Metro–Metro does not haul solid waste to Lakeside. The DFA allows Grabhorn to do business with haulers who are within the Metro jurisdiction. This is how Metro regulates Grabhorn. In contrast, the physician's group was providing medical services to the county-operated medical center. For the situation to be the same, the physicians' group would have to be providing services to a private hospital under the auspices of a license regulated by the county. But that was not the case.

Thus, it will be helpful to review the regulations underlying some of the licensing cases. In <u>Wedges/Ledges of California, Inc. v. City of Phoenix, Ariz.</u>, 24 F.3d 56 (9th Cir. 1994), the city had a blanket ban on new licenses for a crane game, which the city concluded were all games of chance, and revoked some existing licenses for the game. The city code required that the City Treasurer "shall make a determination" on whether each game qualifies as a game of skill and, if the determination is affirmative, the license "shall be issued." <u>Id.</u> at 63. Even though the Treasurer was to consider all relevant information, the decision could not rest on anything other than the game of skill determination. The term "game of skill" was defined to have the judgment, skill, or adroitness of the participant be the designating element of the outcome and not chance. The court contrasted the situation to another case in which the Nevada gaming statute granted the licensing body "full and absolute power and authority" to deny license applications "for any reason deemed reasonable." <u>Id.</u> at 63. The court concluded that the city code created an articulable standard sufficient to give rise to a legitimate claim of entitlement and, thus, a property interest. <u>Id.</u> at 63-64.

The denial of an individual fishing quota ("IFQ") was at issue in <u>Foss</u>, in which the court held that the specific, mandatory regulations implementing the IFQ program created a protectable property interest. <u>Foss</u>, 161 F.3d at 588. The regulations required the defendant agency to grant an IFQ permit "to any qualified person who made legal landings of halibut or sablefish during the qualifying years." <u>Id.</u> at 587.

Finally, in <u>Shanks</u>, the plaintiffs, a group of neighbors and neighborhood associations, believed that an addition to a house was out of character with the historical nature of the neighborhood. Plaintiffs contended they had a protectable property interest which required Spokane to deny the building permit for the addition unless the city complied with the city code

Page 11 - OPINION AND ORDER

applicable to historic districts, including holding a public design review. Under the applicable city code, the Historic Landmarks Commission was to apply defining characteristics and general guidelines prepared and adopted by the same Commission. The Commission could negotiate different management standards for any piece of property. The ordinances required that the decisionmaker consider what the court called "open-ended criteria" and no outcome was mandated. Based on these ordinances, the court held that the city code did not create a constitutionally cognizable property interest in the denial of a third-party's building permit. Shanks, 540 F.3d at 1090-91.

Here, the Metro Code does not give the discretion to the Council that the Commission had in Shanks, where the Commission had open-ended criteria and could negotiate different management standards for each piece of property that came before it. Conversely, the Metro Code is not as mandatory as the regulations in Foss, in which there was a single objective criteria. The Metro Code does provide specific criteria that the Council *shall* consider, but some of the criteria are quite subjective and require predicting future events, such as the "expected impact on the region's recycling and waste reduction efforts." Metro Code § 5.05.030(b)(4). In Wedges/Ledges, the city code was also subjective in that it required the City Treasurer to determine if skill was the designating element of the outcome, even in light of an element of chance also being part of the game.

I conclude that the Metro Code sections at issue are sufficiently mandatory to create a constitutionally protected property interest.

Metro also points to the DFA term which states that the "granting of this Agreement shall not confer a property right to Company." Norton Decl. at 7 ¶ 12(c). The property right here is based on the provisions of the Metro Code and not on the terms of the DFA.

Page 12 - OPINION AND ORDER

  B. <u>The Process which is Due</u>

Metro contends that Grabhorn received all the process it was due prior to termination of the DFA. Metro claims that Grabhorn had notice and an opportunity to be heard before any action was taken.

Grabhorn contends that its allegations are contrary to Metro's argument that due process was provided and any factual analysis of what actually took place is premature in a motion to dismiss.

I agree with Grabhorn. It alleges numerous ways in which it was denied due process associated with Metro's denial of Grabhorn's variance request and the means to appeal the denial. A determination on whether Grabhorn received all the process it was due cannot be made until discovery uncovers what actually happened.

Alternatively, Metro argues that Grabhorn has an adequate remedy under Oregon contract law. Metro relies on <u>Lujan v. G&G Fire Sprinklers, Inc.</u>, 532 U.S. 189, 121 S. Ct. 1446 (2001), in which a subcontractor had a claim for payment it was denied based on the state's determination that the subcontractor failed to comply with the contract's terms. In that situation, the California Labor Code allows a contractor or its assignee to sue the awarding body for breach of contract in not making the payment. That suit was the exclusive remedy of the contractor or assignee under the Labor Code. <u>Id.</u> at 192-93. The Court reasoned that the subcontractor was not denied a present entitlement and that its claim for the payment was fully protected by an ordinary breach of contract suit, as provided in the Labor Code. Thus, the ordinary judicial process was all the process that was due. <u>Id.</u> at 196-97.

<u>Lujan</u> is distinguishable in a few ways. First, the Metro Code does not provide for an exclusive remedy of a breach of contract suit. Second, <u>Lujan</u> distinguished the subcontractor's

Page 13 - OPINION AND ORDER

situation from three other cases: (1) the owner of a house subject to forfeiture under the federal drug laws; (2) the 15-day suspension of a racetrack owner for suspicion of horse drugging; and (3) the suspension of a bank president by the Federal Deposit Insurance Corporation. Id. at 196. The Court reasoned that those three cases concerned claimants denied rights "by virtue of which [they were] presently entitled either to exercise ownership dominion over real or personal property, or to pursue a gainful occupation." Id. The Lujan subcontractor, in contrast, was deprived of payments it contended were owed under a contract. Id.

Grabhorn's situation is similar to the suspension of the racetrack owner. Grabhorn was operating its business and lost the ability to do so, at least concerning its customers within Metro who do not have a non-system license. That is a present entitlement sufficient that a breach of contract suit is an inadequate remedy.

For these reasons, I deny the motion to dismiss the due process claim.

II.  Equal Protection

Grabhorn alleges that its equal protection rights were violated when Metro unilaterally exempted its own solid waste facilities from the EDWRP requirements and granted a variance to Hillsboro Landfill, even though the Metro solid waste facilities and Hillsboro Landfill are similarly situated to Grabhorn's Lakeside.

A.  Class-of-One

Metro contends that the Ninth Circuit has not recognized a class-of-one equal protection cause of action in the context presented by Grabhorn, namely, that of a government managing its own operations rather than acting as a regulator. Metro argues that it has no legal authority to regulate Grabhorn because it is located outside Metro's jurisdictional boundary. It claims that

Grabhorn singled itself out for different treatment by trying to get a variance from code language that applied to all similarly situated people.

Grabhorn characterizes the situation as Metro singling Grabhorn out for arbitrary and capricious treatment which varied from Metro's treatment of similarly situated waste facilities, including Metro's own facilities and Hillsboro Landfill.

> The Equal Protection Clause ensures that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985). The equal protection guarantee protects not only groups, but individuals who would constitute a "class of one." Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000). Where, as here, state action does not implicate a fundamental right or a suspect classification, the plaintiff can establish a "class of one" equal protection claim by demonstrating that it has "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook, 528 U.S. at 564, 120 S. Ct. 1073. Where an equal protection claim is based on selective enforcement of valid laws, a plaintiff can show that the defendants' rational basis for selectively enforcing the law is a pretext for an impermissible motive.
>
> . . . .
>
> Disparate government treatment will survive rational basis scrutiny as long as it bears a rational relation to a legitimate state interest. Although selective enforcement of valid laws, without more, does not make the defendants' action irrational, there is no rational basis for state action that is malicious, irrational or plainly arbitrary.

Squaw Valley Development Co. v. Goldberg, 375 F.3d 936, 944 (9th Cir. 2004) (some internal quotations and citations omitted), abrogation on other grounds noted by Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd., 509 F.3d 1020, 1025-26 (9th Cir. 2007) (discussing substantive due process claim).

Metro again pursues its argument that its actions against Grabhorn were in the nature of Metro managing its contractual relations rather than regulating Grabhorn. Metro relies on Engquist v. Oregon Dept. of Agric., __ U.S. __, 128 S. Ct. 2146 (2008), in which the Court held

Page 15 - OPINION AND ORDER

that the "'class-of-one' theory of equal protection has no place in the public employment context." Id. at 2148-49. In reaching this conclusion, the Court distinguished the government acting as a regulating body from the government acting as a public employer making employment decisions concerning an individual employee. Id. at 2151-54.

As I explained above, I do not accept Metro's theory that it was not regulating Grabhorn. Grabhorn cannot contract with a hauler within the Metro jurisdiction unless Grabhorn complies with the EDWRP or the hauler gets a non-system license. In this way, Metro is regulating Grabhorn. Thus, the analysis within Engquist does not apply.

  B. Rational Basis for Actions

Assuming that Grabhorn can proceed on its class-of-one theory, Metro argues that the equal protection claim fails because Metro had a rational basis for denying Grabhorn's request for a variance. To support the rational basis, Metro relies on the Chief Operating Officer's recommendation that Grabhorn could not meet the intent of the relevant code provision concerning the disposal of non-putrescible waste.

Grabhorn notes its allegation that Metro's conduct was motivated by vindictive action, illegitimate animus, and ill will. Grabhorn argues that it is premature for the court to make a factual analysis of whether Metro's conduct was rational or a pretext for the alleged malicious motives.

Again, it is too early to make a determination of whether there was a rational basis for Metro's conduct. Thus, I deny the motion to dismiss Grabhorn's equal protection claim.

III. Regulatory Taking

Grabhorn alleges that Metro's enactment and enforcement of EDWRP, denial of Grabhorn's variance request, termination of Grabhorn's status as a Designated Facility, and

Page 16 - OPINION AND ORDER

termination of Grabhorn's DFA all effected a regulatory taking on Grabhorn's property which caused a substantial adverse economic effect. Grabhorn clarifies that it is alleging a partial regulatory takings claim, as allowed in Penn Central Transp. v. City of New York, 438 U.S. 104, 98 S. Ct. 2646 (1978), based on both the DFA and its status as a Designated Facility.

Metro argues that Grabhorn's regulatory taking claim fails because Metro has no authority to regulate Grabhorn's property because the property is outside Metro's jurisdictional boundary. Metro claims that any duties are contractual and not regulatory. In requiring Grabhorn to amend the DFA to comply with heightened material recovery standards, Metro claims that it merely affected property interests through some public program adjusting the benefits and burdens of economic life to promote the public good.

Grabhorn argues that Metro confuses its geographical jurisdiction with its regulatory jurisdiction. Grabhorn contends it fell within Metro's regulatory jurisdiction once Lakeside became a Designated Facility and Grabhorn executed a DFA.

In analyzing a generally applicable regulatory taking, "Penn Central acknowledged that it was 'unable to develop any "set formula"' for evaluating these types of claims, but identified relevant factors, such as the economic impact of the regulation on the claimant, the extent to which the regulation has interfered with distinct investment-backed expectations, and the character of the governmental action." McClung v. City of Sumner, 548 F.3d 1219, 1226 (9th Cir. 2008) (quoting Penn Central, 438 U.S. at 124) (requirement to install 12-inch drainage pipe during construction of a new commercial building should be analyzed under Penn Central standards), pet. for cert. filed, 77 U.S.L.W. 3516 (Mar. 2, 2009).

Metro argues that Grabhorn cannot satisfy any of these factors because Metro does not regulate Grabhorn.  Again, I am unpersuaded by this argument.  Accordingly, I deny Metro's motion to dismiss the regulatory takings claim.

IV.    Covenant of Good Faith and Fair Dealing

By entering into the DFA, Grabhorn alleges that Metro had a covenant of good faith and fair dealing which it breached by all of its conduct alleged in the First Amended Complaint, including enforcement of EDWRP, denial of Grabhorn's variance request, termination of Grabhorn's status as a Designated Facility, and termination of Grabhorn's DFA.

Metro moves to dismiss this claim because it argues that the DFA expressly provides for Metro's unilateral termination of the agreement.  To support this argument, Metro notes it passed a resolution on December 18, 2008 which included the finding that "the failure of the [Chief Operating Officer] and Lakeside to establish a Modified Agreement by November 1, 2008 constitutes good cause for termination of the Agreement."  Coe Decl. Ex. 6 at 1.  Thus, Metro argues that it did not violate its duty of good faith by invoking its contractual right to terminate the DFA.

Grabhorn contends that the court cannot make a factual determination at this time of whether Metro had good cause to terminate the DFA.  It also argues that even unilateral contractual rights are not unlimited.

Every contract contains an implied duty of good faith.  Uptown Heights Associates v. Seafirst Corp., 320 Or. 638, 645, 891 P.2d 639 (1995).  The duty is applied in a manner to effectuate the objectively reasonable contractual expectations of the parties.  The duty of good faith cannot serve to contradict express contractual terms, and does not provide a remedy for "an

unpleasantly motivated act that is expressly permitted by contract." Id. (internal quotation omitted).

At this point in the litigation, I cannot make a determination of whether Metro had good cause to terminate the DFA. Accordingly, I deny the motion to dismiss the claim for breach of the covenant of good faith and fair dealing.

## CONCLUSION

Defendant Metro's Motion for Judicial Notice and to Consider Document Outside the Pleadings (#8) is granted as explained above. Plaintiff's Motion to (1) Convert Defendant's Motion to Dismiss to a Motion for Summary Judgment and (2) Hold Motion to Dismiss (Summary Judgment) in Abeyance and Continue Ruling on said Motion pursuant to Federal Rule of Civil Procedure 56(f) (#19) is denied. Defendant Metro's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 56 (#10) is denied. In all claims, Grabhorn has alleged the grounds of its entitlement to relief.

IT IS SO ORDERED.

Dated this      19th       day of May, 2009.

                                                          /s/ Garr M. King
                                                          Garr M. King
                                                          United States District Judge